The People of the State of New York, Respondent, *v.* Benedetto Romeo, Appellant.

First Department, April 17, 1962.

*Nathan Kestnbaum* for appellant.

*Frederick J. Murphy* of counsel (*H. Richard Uviller* with him on the brief; *Frank S. Hogan, District Attorney*), for respondent.

*Per Curiam.* This is an appeal from an order denying an application in the nature of a writ of error *coram nobis* seeking a vacatur of a judgment of conviction of murder in the first degree, entered on May 6, 1946, sentencing the defendant to a term of life imprisonment.

At the trial of the defendant on the charge of murder in the first degree, the principal prosecution witness was one Gramando. After implicating the defendant, Gramando was asked upon cross-examination whether he had received any promise from the District Attorney as inducement for his testimony. To this Gramando replied in effect that while he had entertained certain hopes and expectations he had been made no promise. The pertinent part of this testimony is as follows:

Q. And you told the District Attorney that "If my wife is prosecuted * I will not testify"? A. I didn't say nothing of the kind.

Q. You said something about your wife being arrested? A. That's right.

Q. You asked the District Attorney to help her didn't you. A. That's right.

Q. Yes. And your wife's charge of possessing a loaded firearm was dismissed by the Grand Jury of this County. A. That's right.

Q. You were promised that if you testified in this case you wouldn't be prosecuted for the killing in this case, is that correct? A. You know more than me.

Q. I know more than you? A. Yes.

Q. Perhaps I do. A. You're smarter than I am, but you know more than me.

Q. No one ever told you that. A. Nobody told me anything.

Q. You just came here voluntarily, without any promises, without any consideration? A. That's right. The only thing I hoped was that they would take my wife out, that's all.

Q. You wanted your wife saved? A. Yes, for my baby's sake. My baby means more to me than anybody.

In this *coram nobis* proceeding the defendant contends that Gramando's testimony at the trial relative to the absence of any

---

* Gramando's wife had been arrested and charged with the unlawful possession of a gun.

promise by the prosecutor was false and that the prosecution knew it to be false. At the hearing Gramando testified that his denials at the trial that any promise had been made were false. The Assistant District Attorney, who was associated with the trial assistant and who was present at the time, testified in this proceeding as follows: "I told him at that time that we would do everything we could to get his wife out on this gun charge." He also said: "In my conversation originally with him on June 20, 1945, I did indicate to him that we would try to help his wife, which was a promise I intended to keep."

The District Attorney, in endeavoring to support the position that the testimony given by Gramando at the trial was not false, states that "at no time did I ever make any promises of consideration either directly or indirectly, either by word or anything else in return for his testimony against the defendant Bennedetto Romeo." He does not deny a promise but he contends that it was not given for testimony but in order to induce Gramando to give him information with respect to the killing. We see no difference in substance. While the witnesses' testimony at the trial was not assured, it is difficult to conceive how he could have effectively recanted the story previously given to the District Attorney. The fact is that he did testify, both before the Grand Jury and at the trial, in accordance with the information previously given. Whether the testimony given by the witness was influenced by the promise already performed was for the jury to decide, provided however, that it had been informed of the promise given. It was not so informed. In any event, there is no denying that a promise of some sort was given to the witness. That is in direct conflict with the prosecutor's statements during the trial that "[t]here hasn't been a promise made of any kind" and "[n]ot a single promise ever made to this man."

The record in this *coram nobis* proceeding reveals that the prosecutor did promise to try to obtain a dismissal of the charge pending against Gramando's wife and accordingly, when Gramando testified to the contrary the prosecutor knew he was lying. We conclude that the inaction of the prosecutor in the face of such false testimony so prejudiced the defendant as to require a vacatur of the judgment of conviction and a new trial.

The District Attorney's attempt to minimize the impact of this impropriety is unacceptable. The fact that the jury may have been aware that Gramando had the expectation of helping his wife by his testimony is hardly the equivalent of the jury having knowledge that a promise to help her had in fact been made by the prosecutor. However, even if we assume that

because of Gramando's admitted expectation the jury might have inferred the existence of a corresponding promise, the possibility of such inference was destroyed by the unequivocal statements made by the trial prosecutor during the trial with respect to no promise having been given.

It is idle to say that the jury was not misled by these statements of the prosecutor because even the trial court was apparently convinced that no promise had been made, as evidenced by its statement—"I say there is no evidence in this case whatsoever of any promise being made to this defendant in return for his testimony."

The defendant was entitled to have the jury apprised that a promise, regardless of its nature, had been made to the prosecution's principal witness—a witness without whose testimony there could have been no conviction. The failure of the prosecutor to see that the jury was so enlightened constituted a denial of a fair trial to the defendant (*People* v. *Zimmerman,* 10 N Y 2d 430; *People* v. *Savvides,* 1 N Y 2d 554).

Accordingly, the order denying defendant's motion for a writ of error *coram nobis* should be reversed on the law, the motion granted, the judgment of conviction vacated and the matter remanded for a new trial under the indictment.

VALENTE, J. (dissenting). The majority of this court has concluded to reverse a denial of a writ of error *coram nobis,* and to vacate the judgment of conviction and remand defendant for a new trial. I must dissent since I can find no basis in the facts established at the hearing on the *coram nobis* application which could have perceptibly prejudiced the defendant's right to a fair trial. In May, 1946 the appellant was tried and convicted of the crime of murder in the first degree, and, on the jury's recommendation, was sentenced to life imprisonment. The judgment of conviction was thereafter affirmed by this court (*People* v. *Romeo,* 273 App. Div. 891).

The predicate of this court's reversal is the conclusion that the prosecutor — at the trial of defendant — improperly failed to correct an alleged falsehood in the testimony of a witness, John Gramando, viz., his statement that he had not been promised any consideration for his testimony in the case. In some recent cases (*People* v. *Savvides,* 1 N Y 2d 554; *People* v. *Mangi,* 10 N Y 2d 86) the Court of Appeals upset convictions because of the suppression by the prosecutor of the fact that an important witness testified falsely when denying the existence of any arrangement for leniency in consideration of giving testimony against a defendant. A similar result was reached in *People* v. *Zimmerman* (10 N Y 2d 430) where the witness denied upon

cross-examination that he had made prior statements to the prosecutor, and the prosecutor had failed to correct the falsehood and to produce the statements.

In *People* v. *Savvides (supra)* Judge FULD said (p. 557): " Where a promise of leniency or other consideration is held out to a self-confessed criminal for his co-operation, there is grave danger that, if he be weak or unscrupulous, he will not hestiate to incriminate others to further his own self-interest * * * The failure to disclose an ' understanding ' or a promise cannot but seriously impair the jury's ability to pass upon this vital issue [of credibility] ".

Primarily, I find from the evidence adduced at the *coram nobis* hearing that the jury was apprised of the true facts concerning Gramando's arrangement with the District Attorney, and further that any claimed discrepancy could not in any reasonable likelihood have prejudicially affected the defendant. Essentially, in these matters, the controlling factor should be whether the alleged false testimony " may have had an effect on the outcome of the trial " (*Napue* v. *Illinois,* 360 U. S. 264, 272). Cases, like the instant one — which is being considered by the courts 16 years after a conviction for a serious crime and after the conviction has been affirmed on appeal — cannot, and should not, be disposed of upon finely-spun technical considerations of theoretical fair play but should be decided upon the basis of the actual records in the particular cases. When such a course is pursued herein, a remand for a new trial palpably constitutes a miscarriage of justice and is contrary to the best interests of the proper administration of the criminal law.

The homicide, of which the defendant was convicted in 1946, occurred in 1941 when one Vera Rubin, a patron of a bar and grill, was killed in the course of a holdup there. That killing remained unsolved until 1945, when John Gramando was arrested in connection with the murder of one John Spagna. At the same time Gramando's wife was also taken into custody upon a charge of possession of a gun without a license. Gramando thereupon gave information to the District Attorney concerning the perpetrators of the Rubin homicide and implicating the defendant and himself. Thereafter, the gun charge against his wife was dismissed. It is significant that Mrs. Gramando's discharge preceded by some weeks Gramando's testimony before the Grand Jury that resulted in the indictment of the appellant Romeo.

On June 27, 1945, Gramando was indicted for murder in the first degree in regard to the Spagna killing. Thereafter, in August, 1945, Romeo was indicted, together with Gramando and

two others, for murder in the first degree on the Rubin homicide. Romeo obtained a severance and went to trial in April, 1946. He was convicted of murder in the first degree and sentenced to life imprisonment in May, 1946. As already indicated, on appeal the conviction was affirmed.

Gramando was a witness for the prosecution at the trial of Romeo. The instant *coram nobis* proceeding is based on the claimed falsity of the testimony by Gramando at Romeo's trial regarding any promise by, or arrangement with, the District Attorney in return for Gramando's testimony. As stated in *People* v. *Savvides* (*supra*, p. 557): " It requires no extended discussion, however, to establish that the existence of such a promise might be a strong factor in the minds of the jurors in assessing the witness' credibility and in evaluating the worth of his testimony."

The critical question before us is whether at Romeo's trial there was a sufficient disclosure of whatever arrangement had been made between Gramando and the District Attorney to permit the jury properly to assess Gramando's credibility and to evaluate the worth of his testimony. As a corollary, we are also to determine whether the prosecutor either deliberately or negligently, through inaction, permitted any false testimony by Gramando regarding any such arrangement and, if so, whether he failed to correct it. Finally, if we find that Gramando testified falsely then we must decide whether the prosecutor's inaction, if any, prejudiced the defendant. As I have already indicated, Romeo's proof at the *coram nobis* hearing was not sufficient to warrant a favorable disposition to him on any of these essential issues. Of course, the burden of proof at this hearing was on Romeo (*People* v. *Cooper,* 307 N. Y. 253, 260; *People* v. *Oddo,* 283 App. Div. 497; *People* v. *Gencarelli,* 15 Misc 2d 45, affd. 9 A D 2d 614, affd. 8 N Y 2d 906, cert. denied 364 U. S. 875).

The majority opinion quotes from the trial testimony given by Gramando regarding any promise by, or arrangement with, the prosecutor for his testimony. Gramando admitted that he had asked the District Attorney to help his wife, and that the only consideration that he, Gramando, had been promised, or for which he hoped, was " that they would take my wife out, that's all ". He specifically denied that he had been promised he would not be prosecuted for the Rubin killing if he testified in the *Romeo* case.

At the risk of repetition, the necessity for determining the problem in this case not as an academic exercise but in the actual context of the events at the trial must again be stressed. At

the trial, Gramando admitted that he told the Assistant District Attorney that if his wife were helped he, Gramando, would give information concerning an unsolved homicide case. He also testified that the gun charge against his wife had been dismissed; and that he had committed the murder with which he was charged in the other indictment. Thus the jury had a picture of Gramando at his worst from which to assess his credibility.

The Assistant District Attorney testified in the *coram nobis* hearing, that in June, 1945 (which was before the indictment against Romeo was found), it was indicated to Gramando that his office would try to help Gramando's wife " which was a promise I intended to keep "; and which promise was kept. But that promise was made in connection with obtaining the information about the unsolved homicide. It was neither expressly, nor impliedly, conditioned upon having Gramando testify against Romeo.

Both Gramando's expectation of help for his wife and the realization of that expectation were expressly revealed at Romeo's trial. And, unmistakably implicit in that disclosure was the existence of an arrangement with the District Attorney to assist Gramando's wife — and not just a fanciful hope. It was shown that the charge against the wife was dismissed in June, 1945, at the same time Gramando was indicted for the Spagna killing. The indictment against Romeo was not found until August, 1945. That August, 1945 indictment cleared up the unsolved Rubin homicide case and resulted from the information given by Gramando in exchange for the dismissal of the charges against his wife. The time lapse between the discharge of Gramando's wife and the indictment of Romeo is the touchstone of this *coram nobis* application.

Thus, when Gramando testified at Romeo's trial, the dismissal of the gun charge against Gramando's wife was a *fait accompli*. That, in itself, should suffice to demolish Gramando's testimony in this proceeding that the leniency accorded to his wife was in exchange for his testimony at the trial against Romeo. It must be assumed that had such a crass arrangement existed, the District Attorney would not, in the light of Gramando's past record, have been so impractical as to perform his part of the bargain in advance and have relied on Gramando's good faith to perform *in futuro*.

It is superimposed upon this factual background that we should evaluate the statements of the prosecutor at Romeo's trial that " There hasn't been a promise made of any kind " and " Not a single promise ever made to this man ". The hearing court's finding that when those statements were made they were

made in relation to the pending indictments against Gramando for the killings of Spagna and Rubin is amply supported by the testimony in the instant record. There was a valid basis for the trial prosecutor to distinguish between the completed arrangement to dismiss the gun charge against Gramando's wife in exchange for information regarding an unsolved homicide and a promise to drop those charges in consideration for Gramando's prospective testimony at Romeo's trial. From the vantage point of hindsight, it appears that the trial prosecutor would have been better advised to have qualified his statement with a more ample disclosure of the distinction. In any event, had the trial assistant formally admitted to the arrangement that led to the discharge of Gramando's wife, it would have been sheer surplusage since Gramando had already testified to the circumstances of her release. What was presented on the *coram nobis* hearing was more of a problem of courtroom etiquette than one of the invasion of a defendant's substantial right to a fair trial. For as already shown, the jury was adequately informed of Gramando's having secured the release of his wife on the gun charge in giving the District Attorney information which led to the indictment of Romeo, as well as Gramando himself, for the Rubin murder.

The majority of this court holds that there is no difference in substance between a promise to Gramando in return for testimony against Romeo and an arrangement in order to induce Gramando to give information as to the unsolved homicide; and, it is concluded, that once Gramando had given the information '' it is difficult to conceive how he could have effectively recanted the story previously given to the District Attorney ''. Such a possibility is not at all difficult to envision, since experience teaches that oftentimes stories told by witnesses to police or prosecuting officers are altered when such persons actually testify before a Grand Jury or at trial. The books are replete with cases involving contradictions between statements given by witnesses before trial and their testimony at trial.

I agree with the majority that '' a promise of some sort was given to the witness ''. But the sequence of events concerning Gramando's giving information and the dismissal of the charge against his wife — all done before Gramando testified before the Grand Jury — demonstrates that the promise to release the wife was, as the District Attorney contends, for information and not for testimony. Hence, there was no falsification of testimony when Gramando denied he had received any promise for testimony, nor any misrepresentation by the District Attorney when he stated that no promise had been made for testimony.

248

. While courts must exercise vigilance in securing fair trials for persons accused of crime, there is a concomitant obligation to the community not lightly to overturn convictions — based upon clear proof of guilt and which have already been affirmed on appeal — unless there be substantial proof that defendant did not have a fair trial. On this record it appears that no substantial right of defendant was invaded during the trial and that he has not sustained the burden of establishing that any requirements of due process of law were violated at his trial.

I would, therefore, affirm the denial of the application for an order in the nature of a writ of error *coram nobis* to vacate and set aside the conviction of the defendant.

BOTEIN, P. J., BREITEL and RABIN, JJ., concur in *Per Curiam* opinion; VALENTE, J., dissents in opinion in which McNALLY, J., concurs.

Order entered on February 14, 1961 reversed, on the law, the motion granted, the judgment of conviction vacated and the matter remanded for a new trial under the indictment.